63    66
f197 539

## Wainwright *versus* McCullough.

1. The Allegheny, Monongahela and Ohio rivers are rivers naturally navigable, and have been classed with the Delaware and Susquehanna.

2. The title of a riparian owner on the Allegheny (it being a navigable stream), since the reservation of islands under the Act of 1785, would not include an island opposite his land, but would extend only to ordinary low-water mark on his own side.

3. Between high and low water mark, the title of the riparian owner is qualified, being subject to the right of navigation over it and improvement of the stream as a highway.

4. Between high and low water mark, the riparian owner cannot occupy to the prejudice of navigation, nor place obstructions on the shore without express authority from the state.

5. The Act of April 16th 1858, " to establish high and low water lines in the Allegheny," &c., is not applicable to disputed boundaries between private owners, but for regulating the respective rights of the public and landowners over whose property the right of navigation extends between high and low water marks.

6. The wrongful diversion of the waters of a navigable river from its bed does not extinguish the title of the state nor add to that of individuals.

November 1st 1869.    Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the District Court of *Allegheny county:* No. 98, to October and November Term 1868.

This was an action of ejectment, commenced September 16th 1867, by Zachariah Wainwright against Michael McCullough, for " a piece of land in the borough of Lawrenceville, Allegheny county, bounded on the south-westwardly side by the land of the defendant, formerly of Mrs. Elizabeth F. Denny, on the south-eastwardly side by the north-westwardly low water line (the low water line next Wainwright's, formerly Cork's Island) purporting to have been fixed by commissioners appointed under an Act of Assembly, passed the 16th day of April 1858, entitled ' An Act to establish high and low water lines in the Allegheny, Monongahela and Ohio rivers, in the vicinity of Pittsburg, Allegheny county,' the said low water line beginning at the westwardly line of said piece of land, runs thence, &c.;. on the north-eastwardly side by Allen street as the same is claimed to be continued in said borough, and on the north-westwardly side by the top of the south-eastwardly bank of Wainwright's, formerly Cork's Island, aforesaid."

The cause was tried April 2d 1868, before Williams, J.

The plaintiff gave in evidence a survey, January 31st 1787, of a tract of land to Conrad Winebiddle, on the Allegheny river, Westmoreland county, for 121 acres, &c. ; patent dated December 31st 1787, to Winebiddle for the same tract ; patent dated February 18th 1803, to James Patterson for 5 acres and 7 perches ; also sundry mesne conveyances vesting in Joseph Wainwright part

[Wainwright v. McCullough.]

of the Winebiddle tract, on the 18th of May 1807; the Patterson tract on the 27th of August 1818; and on the 8th of April 1856, another part of Winebiddle tract, viz., " all that certain piece of land in Lawrenceville, bounded, &c., by Water street on the north, by Allen street on the east, by the Allegheny Valley railroad on the south, and by other property of said Joseph Wainwright on the west."

Also the will of Joseph Wainwright, dated January 16th 1866, devising as follows: " To my son, Zachariah Wainwright, all the lot or lots of land on which I now reside. Beginning at a stake on my private road opposite the west corner of land belonging to the heirs of P. Dravo, and on the line that divides my land from Mrs. Denny's land, and thence along said line to the Allegheny river, and into the river as far as my right extends, and thence up the bed of the river to the north corner of my land where it abuts on the street of the said borough of Lawrenceville, thence along the line that divides my land from the borough lots to the north corner of the land belonging to the heirs of P. Dravo, thence along the line that divides my land from the heirs of P. Dravo to the place of beginning, containing about nine acres."

He gave evidence that boats in 1839 passed through the channel between the main land and Wainwright's Island. McCullough's mill was on the main land; a dam was built in 1845 which caused the channel to fill up, after which boating could not be done through the channel; the channel ran along the island for part of the way and then across to the main land to Denny's land: there is now no channel at low water; the water runs around the head of the island; there are no water privileges now; there is a solid road, called Allen street, built across to the island.

The plaintiff then offered in evidence the record of an indictment in the quarter sessions of Allegheny county against McCullough, the defendant, conviction and sentence: offered for the purpose of showing that the defendant, prior to, and at the time of the finding of the indictment, erected and maintained across the channel between Wainwright's Island and the main or eastern shore, a dam built with logs, which obstructed the navigation thereof. That the channel of the river so obstructed was and had been a navigable highway, prior to the erection of said dam, and that said dam was an unlawful structure, and the defendant was sentenced to remove it.

Also the record of an action in the District Court of Allegheny county, Joseph Wainwright against McCullough, the defendant, for the purpose of showing that defendant had committed acts of trespass on the land now in dispute, and that the plaintiff recovered damages against him for the same.

Also to prove that Mr. McCullough, several years ago, arranged with the authorities of the borough of Lawrenceville to bridge and

[Wainwright *v.* McCullough.]

fill up Allen street across the channel to his island, and subsequently at his instance, an Act of Assembly was passed April 12th 1867, authorizing the burgess and town council of said borough to extend Allen, Pike and Covington streets, in said borough, through and across that portion of the river lying between Wainwright's Island and the main shore, and fill up or embank that portion of said river occupied by the extension of said streets, so as to make a uniform grade, and after the passage of said act, he agreed with the borough authorities, that if they would fill up said channel, that he would pave it at his own expense.

All these offers were rejected, and several bills of exceptions sealed.

The plaintiff having rested, the defendant gave in evidence: "Memorandum of agreement (dated August 12th 1844) between Joseph Wainwright, of, &c., and Michael McCullough, Jr., of, &c. The said Wainwright agrees to give said McCullough, Jr., a good and sufficient deed for what is known as Wainwright's Island, in the Allegheny river, &c., and containing about seven acres. As also for all the water privileges made by said island that is now in the right of said Wainwright, and the privilege of erecting any mills or machinery between said island and the east shore, with the liberty of using as much of the said shore belonging to Wainwright, as may be between the water and the trees growing along the same, but not to be construed to abut any dam against any part of Wainwright's land on the main shore. The consideration for the above deed when made, is, that the said McCullough, Jr., will pay to the said Wainwright, his heirs or assigns, the sum of $100 per year, payable semi-annually, unless the said McCullough shall see proper at any time hereafter to pay to the said Wainwright, his heirs or assigns, the sum of $1666.66, when the said yearly sum of $100 shall cease, and be forever extinguished." * *

Also deed between the same parties, dated March 29th 1856, which witnessed: That the said party of the first part, for and in consideration of $1666.66  *   *   *  hath granted, &c.   *   * unto the said party of the second part, his heirs and assigns, all that certain island or piece of land situate in Allegheny county, &c., in the Allegheny river, known as Wainwright's Island, and containing about seven acres, be the same more or less—as also, all the water privileges made by said island that is now in right of said Wainwright (and was in him August 12th 1844, and which was agreed to be conveyed by the agreement of that date), and the privilege of erecting any mills or machinery between said island and the east shore, with the liberty of using as much of the said shore belonging to Wainwright as may be between the water and the trees growing along the same, but not to be construed to abut any dam against any part of Wainwright's land on the main shore,

[Wainwright v. McCullough.]

the said land being the same which was formerly known as "Cork's Island," and which was granted by the Commonwealth of Pennsylvania to George Wallace, by patent dated July 22d A. D. 1806, who with his wife, by their deed dated September 19th A. D. 1806, and recorded, &c., conveyed the same to the said Joseph Wainwright—to have and to hold the said before mentioned island or piece of land, and privileges hereinbefore mentioned, unto the said party of the second part, his heirs and assigns, to and for the only proper use and behoof of the said party of the second part, his heirs and assigns forever. * *

The plaintiff gave evidence generally for the purpose of showing where the channel between the island and the main land was at the date of the patent to Winebiddle, and subsequently until obstructed and filled by the dam, &c., of the defendant.

Also, Act of April 16th 1868 (Pamph. L. 326), "to establish high and low water lines in the Allegheny, Monongahela and Ohio rivers, in the vicinity of Pittsburg, in Allegheny county."

The preamble of the act is: "Whereas the lines of lands on and along the shores of the rivers at and near the city of Pittsburg, in the county of Allegheny, have never yet been clearly ascertained, and as it is important to the owners of such lands, the persons navigating the waters of, and the corporations adjacent to such rivers, and to all parties interested, to know and have their several rights and privileges in extension and limitation ascertained and defined," &c. The act required the District Court of Allegheny county to appoint three commissioners, who, after giving notice of the time and place of their meeting, should "examine the shores, surveying and marking thereon lines of ordinary low water and high water marks along the rivers Monongahela, Allegheny and Ohio, within the following limits (designating them), * * * and around the shores of all the islands in the rivers aforesaid, and within the limits aforesaid, * * * such lines of low and high water to be laid out along said shores in such manner and position as will most perfectly secure and perpetuate the navigable channels of said rivers, and best promote the safety and convenience of vessels, rafts and persons navigating the same, and as will be most suitable in all respects for the general benefit of the public at large." The act also required the commissioners to make a correct map of their work, and return it to the District Court, the prothonotary to file it for public inspection, and give notice by publication in newspapers, of the day—to be fixed by the court—when objections would be heard, and after hearing the objections and making alterations, if any should be found necessary, the Court should direct the map to be recorded, and thenceforth it "shall be taken and allowed for the purposes herein mentioned and contained, and the lines so approved shall forever after be deemed, adjudged and taken firm and stable for the purposes aforesaid."

[*Wainwright v. McCullough.*]

The act also vested the riparian right which was in the state in the " corporations within whose limits the same is or hereafter shall lie." Also, the record of the appointment of commissioners under the act, with their report and final order of confirmation, June 22d 1861. The defendant further gave evidence by drafts and oral testimony for the purpose of showing the location of his own and plaintiff's land; the building of defendant's mill, the character of the channel between the island and the main land, &c., and other matters deemed proper to meet the plaintiff's case.

The land claimed by the plaintiff lies between the low water line fixed by the commissioners, which is next the island, and the centre of the old channel as it existed prior to the filling up occasioned by McCullough's dam, being the portion of land embraced between the high and low water lines of the defendant's island as fixed by the commissioners.

The plaintiff submitted ten points, viz.:

1. By the patent to Winebiddle his title extended to the middle of the channel as it was in December 1787, the Allegheny river then not having been declared a highway.

2. The act subsequently declaring the river a highway did not divest Winebiddle's title between the centre of the channel and the low water line on the main shore.

3. The Act of 1858 and the action of the commissioners could not divest the title of those claiming under Winebiddle to the ground between low water mark and the centre of the channel.

4. The Patterson patent gave to him and his successors in title, a right, at least to a front on a navigable stream, of which the Commonwealth could not deprive them; the same principle applies to the Winebiddle patent.

5. The effect, if any, on the rights of the plaintiff of the establishment of lines under the Act of 1858 ceased as soon as the branch was closed up.

6. As the river was forced by the acts of the defendant from that part of its channel between the island and mainland, the ground on the plaintiff's side pertains to him to the centre of the low water channel as it was before the acts of the defendant.

7. " The articles of agreement and the deed are to be construed with reference to the circumstances at the time, to wit, the island as an island and the intervening ground to the east shore as the bed of that part of the river, and the privileges or liberties granted continued only as long, at the most, as the island continued an island, the ground between it and the east shore continued to be a part of the river's bed, and the shore a part of its shore, and when they ceased to be such, the privileges or liberties ceased."

8. " The liberty of using as much of the shore belonging to Wainwright as may be between the water and the trees growing

[Wainwright *v.* McCullough.]

along the same," in the article and deed, is restrictive, and confines McCullough within narrower bounds than if the clause had not been inserted.

9. " The privilege of erecting any mills, &c., between said island and the east shore," continued only as long as there was an island on one side of it and a shore on the other; and at most it was only an agreement that McCullough might obstruct that part of the river by erecting " mills," &c., in it, and Wainwright would not do anything to prevent him from doing so. It cannot be applied to the *locus in quo* after it ceased, by the acts of the defendant or of the Commonwealth, to be a part of the river and became a part of the main land, at a distance from the river.

10. If the jury believed, under all the evidence, that that part of the river was filled up by sediment in consequence of the acts of defendant, the plaintiff is entitled to recover to the centre of the low-water channel, as they may find it to have been before the defendant did the acts that occasioned the filling up."

The court, after referring to the facts, the Act of 1858 and the proceedings under it, charged : * * *

" This ejectment is not brought for any portion of the main land belonging to the plaintiff or his testator, nor for any part of the land embraced between the high and low water lines, as established by the commissioners along the bank or shore of the said main land, nor for any portion of the bed of the channel or stream as laid down and fixed by the commissioners, but the land embraced between the high and low water lines of the defendant's island, as the same was fixed by the commissioners and established by the decree of this court confirming the same. It seems to me, therefore, that the plaintiff is estopped from claiming any portion of the land embraced within the high and low water lines of defendant's island, as thus fixed and established; and that it is too late for him to raise the question whether the land in controversy constituted, at one time, a part of the channel between the island and the main land, and whether it was situated on the main land side of the centre of the island channel. If the Act of Assembly is of any validity, and if the proceedings of the commissioners under it, and the decree of this court confirming the same, are to have any force or effect, they are conclusive upon the rights of the parties. If the Act of Assembly has no validity—if the proceedings under it have no legal force or binding obligation, it is time that the riparian owners and the public understand it. The county has expended a large sum of money in carrying out the provisions of the act for establishing the high and low water lines authorized by it, and as we all know, the riparian owners and the public have acquiesced in and conformed to the lines thus established. If this expenditure has been all in vain, it is time that the community understand it. The very small number of except-

[Wainwright *v.* McCullough.]

ants, not exceeding three or four, shows that the commissioners must have performed their work with judgment and discretion, and to the general satisfaction of the parties interested in it. It seems to me that the riparian owners are bound by the high and low water lines thus established, and that the plaintiff is estopped from claiming the land in controversy, or of raising the question whether the same was or was not a part of the bed of the channel and situate on the south-eastern or main land side of its centre. And the court instructs the jury that, under the evidence in the case, the plaintiff is not entitled to recover, and that their verdict should be for the defendant. This view of the law renders it unnecessary to consider the numerous points presented by the plaintiff's counsel, and so far as they have not been answered in the charge, they are refused."

The verdict was for the defendant.

The plaintiff took a writ of error. He assigned for error: the rulings as to evidence—the refusal of his points and the charge of the court.

*T. MacConnel* (with whom were *J. MacConnel* and *R. & S. Woods*), for plaintiff in error.—The court was bound to give specific answers to the points: Act of April 15th 1856, § 1, Pamph. 337, Purd. 1284, pl. 2; Wheeler *v.* Winn, 3 P. F. Smith 122. A grant on a stream not navigable carries the title to the middle of the channel, and a subsequent law making the stream navigable does not divest the title: Coovert *v.* O'Connor, 8 Watts 470; Naglee *v.* Ingersoll, 7 Barr 201; Jones *v.* Janney, 8 W. & S. 436; 3 Kent Comm. 427, 438; Barclay Railroad and Coal Co. *v.* Ingham, 12 Casey 194; Scratton *v.* Brown, 4 Barn. & Cress. 499; Justinian C. C. Lib. 2, Tit. 1, §§ 20, 21, 23; Commonwealth *v.* Shaw, 14 S. & R. 12. The ground added by alluvion belongs to the riparian owner. If the change of the stream was produced by one of the riparian owners, it would not necessarily continue to be their boundary: Ball *v.* Slack, 2 Whart. 508. The Act of 1858 is constitutional: Bell *v.* Ohio and Penna. Railroad, 1 Grant 106; Erie and N. East Railroad *v.* Casey, 2 Casey 307; Bonaparte *v.* Camden and A. Railroad, Baldwin 220; Vattel 112; Burlamaqui 150; Puffendorff 829; Grotius 333; Rhines *v.* Clark, 1 P. F. Smith 101; Pittsburg *v.* Scott, 1 Barr 309; Lambertson *v.* Hogan, 2 Barr 24. Contracts are to be construed in reference to the circumstances at the time they were made: 1 Greenleaf's Evid., § 287; Stub *v.* Stub, 3 Barr 254; Philadelphia Life Ins. Co. *v.* American Ins. Co., 11 Harris 67; Lehigh C. and N. Co. *v.* Carlin, 3 Casey 439.

*B. F. Lucas* (with whom was *A. G. Lucas*), for defendant in error.—The erection of the dam was under the joint act of both

Wainwright and McCullough, and the accretions arising from it are to be governed by the same rules as to them as natural accretions; the court could not have given an affirmative answer; any other would have injured the plaintiff, and he therefore could not complain: Deal v. Bogue, 8 Harris 228; Childs v. Digby, 12 Id. 23. The condition of the channel at the date of the deed, not of the agreement, is the time to be considered: Jones v. Johnston, 18 Howard 156; Johnston v. Jones, 1 Black 209. As to the Act of 1858 he cited Parsons v. Winslow, 1 Grant 160. But even if there be defect in defendant's title, the plaintiff has shown no title at all to the land claimed in the writ, and therefore cannot recover.

The opinion of the court was delivered, January 3d 1870, by

AGNEW, J.—This cause comes before us upon a single but important question. The court below ruled the case upon the effect of the low and high water lines as established by commissioners under Act of 16th April 1858, Pamph. L. 326, which excluded the plaintiff from the land described in his writ, and prevented his recovery. In order to arrive at the legal effect of the lines established by the commissioners under that act, we must ascertain its true purpose; and to reach this, it becomes necessary to examine the navigable character of the rivers Allegheny, Monongahela and Ohio, and the rights of the riparian proprietors upon their banks. These rivers are among the largest in the state; larger than the Schuylkill and Lehigh, recognised as navigable in the early history of the province, and have been repeatedly held by name to be rivers naturally navigable, and therefore classed with the Delaware and Susquehanna: Carson v. Blazer, 2 Binney 478; Shrunk v. Schuylkill Nav. Co., 14 S. & R. 79, 80; Hunter v. Howard, 10 Id. 244. Many acts have been passed declaring tributaries of these rivers navigable. But an act perhaps most pertinent to this controversy is that of 8th April 1785, 2 Sm. Laws 317, regulating the taking up of lands within the new purchase, of which the 13th section expressly excepts *islands* in the Ohio, *Allegheny* and Delaware. The exception bears directly on the claim of title by the plaintiff to the middle of the stream, under the patent of Conrad Winebiddle, dated December 31st 1787.

Wainwright's Island, involved in this controversy, lies on the eastward side of the middle thread of the stream, and separated from the eastern shore by a small branch, so that the plaintiff's title to the middle of the stream, if allowed, would embrace the island. But the reservation of the islands by the Act of 1785, passed before the inception of the Winebiddle title, recognises the navigable character of the Allegheny, and the title can extend only to ordinary low-water mark on the eastern shore of the river.

This being the navigable character of the stream, the rights of the riparian owners are settled by numerous decisions, a few of

[Wainwright *v.* McCullough.]

which may be referred to: Carson *v.* Blazer, *supra;* Shrunk *v.* Schuylkill Nav. Co., *supra;* Ball *v.* Slack, 2 Whart. 508; Zimmerman *v.* Union Canal Co., 1 W. & S. 346; Bailey *v.* Miltenberger, 7 Casey 37; McKeen *v.* Delaware Div. Canal Co., 13 Wright 424; Tinicum Fishing Co. *v.* Carter, 11 P. F. Smith 21, opinion by Sharswood, J., decided last winter at Philadelphia. From these and other cases, it will appear that the absolute title of the riparian proprietor extends to high-water mark only, and that between ordinary high and ordinary low water-mark, his title to the soil is qualified, it being subject to the public rights of navigation over it, and of improvement of the stream as a highway. He cannot occupy to the prejudice of navigation or cause obstructions to be placed upon the shore between these lines, without express authority of the state.

The case of Bailey *v.* Miltenberger, 7 Casey 37, decided in 1856, doubtless had something to do in turning public attention to the shores of the streams surrounding the city of Pittsburg, which led to the passage of the Act of 1858, for the purpose of defining the low and high water-lines. It referred to the mistaken idea entertained by some proprietors of making ground for their mills, by depositing cinders on the shore between low and high water marks. "The Allegheny and many other navigable rivers" (says the opinion) "do not, at the time of low water, occupy over one-third of their bed; and it would be most disastrous to allow every owner to fill out his land to low water-mark." This state of affairs, for these rivers had been seriously encroached upon at and opposite Pittsburg, no doubt led to the Act of 16th April 1858, Pamph. L. 326. It begins by a recital, "Whereas, The lines of lands on and along the shores at the rivers at and near the city of Pittsburg, in the county of Allegheny, have never yet been clearly ascertained, and as it is important to the owners of such lands, the persons navigating the waters of, and the corporations adjacent to, such rivers, and to all parties interested, to know and to have their several rights and privileges in extension and limitation ascertained and defined; therefore," &c. The first impression arising from this language might seem to be that the law was intended to ascertain and fix these high and low water lines to end all controversies, *private* as well as public. But a careful consideration of its purpose and provisions shows that it is not applicable to disputed boundaries between private owners, but was intended to regulate the respective rights of the public and the landowners, over whose property the right of navigation extends between high and low water lines.

The subject itself is incompatible with a regulation of boundaries between landowners, for the bed of the stream belongs to the state, and necessarily lies between and excludes controversy with an opposite owner, while the act itself refers to no other lines than

[Wainwright v. McCullough.]

those of low and high water.  It exhibits no purpose to define boundaries between private owners running in toward the stream. The boundary adjusted is therefore necessarily between the state and the riparian owner, for low and high water lines on a navigable river can concern no other owners.  This accords with the parties enumerated in the preamble, to wit,—the owners of the lands, the persons navigating the waters, and the corporations adjacent—that is, the cities and boroughs which regulate the landings and ways to and from the rivers.  The second and third parties exercise the rights of the public, and therefore are deeply interested in the establishment of the lines of low and high water, but can have no interest in a dispute about boundaries between individuals.

Coming to the duties of the commissioners as set forth in the second section, the law says:—" Such lines of low and high water to be laid out along said shores aforesaid in such manner and position as will most perfectly secure and perpetuate the navigable channels of said rivers, and best promote the safety and convenience of vessels, rafts, and persons navigating the same, and as will be most suitable in all respects for the general benefit of the public at large."  In the third section they are required not only to hear the parties interested, but to examine experienced hydraulic civil engineers, scientific men and others for the purpose of obtaining accurate information in regard to flowing water in navigable streams, and in regard to the location of the lines aforesaid. Evidently the parties interested are the private owners of the lands extending to the river on the one hand, and the parties navigating and corporations adjacent to the river on the other, while the mere ascertainment of the actual position of a private boundary between owners is inconsistent with the discretion required by the act to be exercised in locating the high and low water lines, so as to preserve the channels of navigation, and promote the safety and convenience of vessels, rafts and persons navigating the same, and for this purpose to call in the aid of scientific men.  The effect of the lines as established is thus stated: " the lines so approved shall for ever after be deemed, adjudged and taken, firm and stable for the purposes aforesaid." If we seek for the " aforesaid" purposes, the act discloses none but those relating to the public interest and that of the riparian owner.  Then if we advert to the power of the state over navigable streams, as stated in the authorities cited, we discover that it is plenary over the subject of navigation and the improvement of these natural channels of commerce, while the ownership of the riparian proprietor is qualified between the lines of low and high water.  The legislature may, therefore, with great propriety define the bounds of high and low water, by means of a suitable commission, for the purpose of regulating the public right, so as not

[Wainwright *v.* McCullough.]

to conflict with private interests, and to prevent private rights from being exercised to the prejudice of public interests; for example, to prevent the shores from being filled up with great banks of cinders. But if the intent were to regulate disputed boundaries between private owners, what machinery compatible with the lawful determination of private rights has the legislature provided? No right of appeal is given as in the case of party-walls and partition fences. And the private right would be determined by commissioners in derogation of the right of trial by jury. Now, without determining whether this is constitutional or not, it is a circumstance against the interpretation of the act in that way. In the case of Wells *v.* Fox, 1 Dall. 308, we have some analogy to the present question. There it was determined that the feigned issue to be ordered on an appeal from the determination of the regulators of party-walls, could determine only whether the regulators had acted correctly or not, but not the title. For the latter purpose an ejectment was considered the proper remedy. For these reasons we are of opinion that the commission under the Act of 1858 settled no disputes, and ascertained no boundaries, as between private owners. The effect of this conclusion would be to reverse the judgment of the court below, but for another difficulty which meets the plaintiff below on the very threshold of his case. By his own showing he had no title to the land described in his ejectment. The writ describes the land claimed by the plaintiff as lying between the low-water line of the island as fixed by the commissioners and the top of the island bank. The land thus described, therefore, is a part of the island and lies westward of the channel or branch which runs between it and the main land. The title of the plaintiff given in evidence was under the Winebiddle patent for the main land lying on the eastern bank of this branch. Thus the channel of the branch which belonged to neither the owner of the main land nor the owner of the island, but was the property of the state, intervened between the land owned by the plaintiff and the shore of the island for which he brought his suit, and effectually cuts off his recovery.

According to the plaintiff's own showing, this was no case of mere alluvion, or of a river forsaking its bed from ordinary and natural causes. He gave evidence to show, and indeed proved, by many witnesses, that the old channel ran next to the island, and began to fill up after the defendant had built his dam from the island to Denny's land on the main shore; that the process of filling was accelerated by the abutment built by the defendant above the dam, and was finally consummated by the bridges built across from the main land to the island.

From what has been said of the Allegheny as a river naturally navigable, recognised by statute law and judicial decisions, it is

[Wainwright *v.* McCullough.]

clear that the ownership of its bed between islands and the shore, as well as its main channel, belongs to the state. A wrongful diversion of its waters from its bed does not extinguish the title of the state, or add to that of individuals. This is evident upon principle, and finds an analogy in the decision in Allegheny City *v.* Reed, 12 Harris 39, holding that after Smoky or Killbuck Island had been swept away by the floods, leaving only a bare sand and gravel bottom, it was the property of the state, and not liable to appropriation as an island.

Having shown no title whatever to the land described in the writ of ejectment, the plaintiff's case is at an end. And for this reason the bills of exception to the rejection of certain evidence relating to acts of the defendant, his conviction and sentence, the former action of trespass, &c., became immaterial. The plaintiff must recover on the strength of his own title alone.

The judgment is therefore affirmed.